UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED BUNKERING & TRADING (HK) LTD.,

                Plaintiff,

- against -

JIMEI HUA SHIPPING CO., LTD.

                Defendant.
------------------------------------------------------------X

Case No.: 08 CV _____ (   )

**VERIFIED COMPLAINT**

RECEIVED DEC 08 2008 U.S.D.C. S.D.N.Y.

Plaintiff UNITED BUNKERING & TRADING (HK) LTD. ("Plaintiff"), by and through its attorneys, Clyde & Co US LLP, as and for its Verified Complaint against the Defendant JIMEI HUA SHIPPING CO., LTD. ("Defendant"), alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

2. At all times material hereto, Plaintiff was and is a foreign business entity duly organized and existing under the laws of Hong Kong.

3. Upon information and belief, at all times material hereto, Defendant was and is a foreign business entity duly organized and existing under the laws of The British Virgin Islands.

4. On or about September 8, 2008, Plaintiff sold and delivered marine fuel to Defendant for supply of the M/V "JIMEI DA" pursuant to a contract known as the "March 2008 General Terms & Conditions of Sales Concerning the Supply of Bunker Oil by United Bunkering & Trading (U.B.T.)" (the "Contract"). A copy of the Contract is attached hereto as

Exhibit "A." Copies of the Tax Invoice, Sales Confirmation and Delivery Receipts evidencing this sale are attached hereto as Exhibit "B."

5. Defendant breached the Contract when, without authority and despite due demand, it failed to pay to Plaintiff the sum of $171,600.00 due and owing to Plaintiff in accordance with the terms of the Contract. As of the date of this Complaint, the invoice is 62 days overdue.

6. Pursuant to Clause 6.2 of the Contract, Plaintiff is entitled to contractual interest of 2% per month on the overdue amount, which totals $6,960.10 as of the date of the Complaint.

7. As a result of Defendant's breach of the Contract, Plaintiff has sustained damages in the total principal amount of at least $178,560.10, exclusive of interest, costs and attorneys fees.

8. Plaintiff has complied with all terms and obligations under the Contract.

9. The Contract provides that all disputes arising thereunder are subject to the non-exclusive jurisdiction of the Singapore Courts, with Singapore law to apply.

10. Plaintiff is in the process of commencing an action in the Singapore Courts for this breach of contract.

11. Interest, costs and attorneys' fees routinely are awarded to the prevailing party in the Singapore Courts pursuant to Singapore Law. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | |
|---|---|---|
| A. | Principal claim | $ 178,560.10; |
| B. | Estimated interest on claim- 3 years at 7.5% compounded quarterly: | $ 44,589.38; |
| C. | Estimated attorneys' fees and expenses: | $ 100,000.00; |

Total:                                                                                          $ 323,149.48

12. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant. *See* Affidavit of Nicholas Magali dated December 8, 2008.

13. The Plaintiff seeks an order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiffs' claims as described above.

WHEREFORE, Plaintiff prays as follows:

A. That process in due form of law issue against the Defendant, citing the Defendant to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against them in the sum of $323,149.48;

B. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, electronic fund transfers, debts and monies, tangible or intangible, or any funds up to the amount of $323,149.48 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but

not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for their benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.  That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.  That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

E.  That in the alternative, this Court enter Judgment against the Defendant on the claims set forth herein;

F.  That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

G.  That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: December 8, 2008
      New York, New York

                                 CLYDE & CO US LLP

                                 By: _____
                                 Christopher Carlsen (CC 9628)
                                 Nicholas Magali (NM5775)
                                 405 Lexington Avenue
                                 New York, New York 10174
                                 Tel: (212) 710-3900
                                 Fax: (212) 710-3950

                                 Christopher.carlsen@clydeco.us
                                 Nicholas.magali@clydeco.us

                                 Attorneys for Plaintiff

EXHIBIT A

General Terms & Conditions of Sales Concerning the Supply of Bunker Oil by

United Bunkering & Trading (U.B.T.)

March 2008

APPLICATION

Unless it is otherwise agreed in writing between the Seller and the Buyer, these General Terms and Conditions of Marine Fuel Contract ("General T & Cs") shall apply to any Contract of sale of Marine Fuel between the Seller and the Buyer of such Marine Fuel. Where the Seller agrees expressly with the Buyer in writing for a particular term or terms to be included in their Contract, which are inconsistent with these General T & Cs, such particular term or terms shall prevail over these General T & Cs only to the extent of such inconsistency.

DEFINITIONS

In these General T & Cs, the following terms shall, unless the context otherwise requires, have the following meanings:

1.1 "Buyer" shall mean the company buying the Marine Fuel under a Contract from the Seller and shall include its servants, agents and designated representatives.

1.2 "Seller" shall mean United Bunkering & Trading (Asia) Pte Ltd and shall include any of its branch offices, servants and designated representatives.

1.3 "Marine Fuel" shall mean the different grades of Bunker Fuel Oil, Intermediate Bunker Fuels, Marine Fuel Oil, Thin Fuel Oil, Marine Diesel Oil, Light Marine Diesel Fuel and Gas Oil or any other type and grade of oil contracted to be delivered or arranged to be delivered by the Seller.

1.4 "Contract" shall mean an agreement by the Buyer to buy and a corresponding agreement by the Seller to sell and deliver or to arrange for the sale and delivery of Marine Fuel of a specified quantity at a specified price.

1.5 "Delivery Port" shall mean a port at which the Seller delivers or arranges for the delivery of Marine Fuel under a Contract.

1.6 "Company" shall include a natural person, an unincorporated body, a governmental-agency or a statutory corporation.

1.7 "Vessel" shall mean the ship or vessel(s) nominated to take delivery, or taking delivery or having taken delivery of the Marine Fuel under a Contract on behalf of the Buyer and to which Marine Fuel is to be, has been or arranged to be delivered by the Seller.

PRICE

2.1 The price of Marine Fuel shall be the price quoted by the Seller and accepted by the Buyer as confirmed in the Contract for the relevant type of Marine Fuel delivered or to be delivered. The Buyer shall also pay the Seller for all and any taxes, levies, duties, expenses, delivery charges, barging fees, jetty fees and other costs (including without limitation, those imposed by governments and authorities) arising out of or incurred by the delivery of such Marine Fuel under the Contract which shall be included in the Seller's invoice to the Buyer. The Buyer shall furthermore pay any extra costs connected with deliveries made on Saturdays, Sundays and Public Holidays, and outside of normal working hours at the place of delivery/work. Payments according to the present provision shall be made pursuant to the rules stipulated under point 6.

DELIVERIES

3.1 Where the Seller accepts delivery nominations at Singapore port, all such deliveries shall be within the port limits of Singapore, unless delivery outside of such port limits is agreed in writing by the Seller.

3.2 Where the Seller accepts delivery nominations at other ports, all such deliveries shall also be within the port limits of such other ports, unless delivery outside of such port limits of such other ports is agreed in writing by the Seller.

3.3 All deliveries under a Contract shall be made ex-wharf or ex-light/barge in accordance with the instructions given by the Buyer or the Master of the Vessel, subject to the Seller's agreement to such instructions, which agreement shall be reached before commencement of the time for delivery by the Seller under the Contract. The Seller is entitled to suspend delivery of the Marine Fuel under the Contract until such agreement is reached, and if no such agreement is reached within fourteen (14) days from the time of delivery under the Contract, the Seller shall be entitled to terminate the Contract but without prejudice to the Seller's right to claim damages from the Buyer.

3.4 The Buyer shall alone bear the responsibility and risk for the choice of bunker oil and the Seller shall not be obliged to check whether said choice is suitable for the vessel in question. If the oil lives up to its specifications and is generally of the same quality as the oil marketed in the geographical area concerned, the Seller shall have performed correctly in this respect. Any information provided by the Seller as to the characteristics of Marine Fuel shall not be construed as specifications of Marine Fuel to be delivered under a Contract to the Buyer and shall be regarded as ex-gratia only.

3.5 The Buyer shall give the Seller, unless otherwise agreed to or requested by the Seller, at least five (5) days' advance notice of requirements (excluding Saturdays, Sundays and Public Holidays, and during normal workdays between 09:00 to 17:00 hours by email, telex or telefax, unless waived by the Seller) prior to the time of requested delivery. Such notice shall identify the Buyer and Contract and shall specify all delivery details, including but not limited to, the port, name of Vessel, the agent of Vessel, its estimated time of arrival, approximate date of delivery, location of vessel, method of delivery and confirmation of the grade and quantity of Marine Fuel ordered. The Buyer or the agent of the Vessel shall give the Seller at least Forty-Eight (48) hours' confirmation notice (excluding Saturdays, Sundays and Public Holidays, and during normal workdays between 09:00 to 17:00 hours by email, telex or telefax, unless waived by the Seller) of the exact quantity of Marine Fuel required and the exact location and exact time at which delivery is required. If the Buyer makes any changes after the confirmation notice, bunker delivery will be subject to point 3.7.

Notwithstanding the foregoing, the Buyer shall be liable for any costs or expenses incurred by the Seller resulting from the failure by the Buyer to take delivery of or rejecting in part or in full the quantity of Marine Fuel ordered under the Contract.

3.6 Delivery of Marine Fuel by the Seller to the Buyer shall be carried out, inter alia, subject to any regulations, requirements and procedures (including any amendments and revisions thereof) as may be prescribed from time to time by any governmental authority at the port at which the Seller accepts delivery nominations. The Buyer shall, in any event, be solely responsible for ascertaining, acquainting itself and complying with inter alia, all such regulations, requirements and procedures which are applicable at the Delivery Port and in complying with all relevant berth restrictions and requirements.

3.7 Vessels, including tankers, shall be supplied as promptly as circumstances permit, but Seller shall in no event be liable for any losses or demurrage, whatsoever and howsoever incurred by the Buyer due to or arising in connection with any delay or congestion at the shore terminal, or to any other commitment(s) of available barges in the delivery of Marine Fuel under the Contract to the Buyer. This condition will also apply where bunker delivery does not take place during the major holidays and practices of that port or country.

3.8 The Buyer shall be responsible for all connections and disconnections of delivery hose to the Vessel. The Buyer shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly the delivery under the Contract. Where delivery is undertaken ex-wharf, the Buyer shall promptly receive the delivery and withdraw the Vessel from shore terminal or wharf once delivery is completed.

3.9 If it is substantiated, cf. points 5.2 to 5.5, that the Seller due to error or neglect has supplied bunker oil which does not live up to the quality, as stated under point 3.4, the Seller shall be liable for any substantiated loss caused thereby; the Seller shall however not be liable for any loss of the Buyer through lost contracts, and the liability shall be limited to the cost of repairing machine parts plus three (3) days of lost time provided the Charter Party and/or any legal document is provided by the Buyer.

3.10 The risk for the bunker oil shall be transferred successively, as it passes through the fixed receiving connector in the Buyer's vessel.

3.11 In addition to the Buyer being responsible for payment of the purchase price and any costs pursuant to point 2.1, the Seller reserves the right to look to the owner of the vessel to the extent the ship owner is responsible pursuant to the legislation of his homeland, and the Seller furthermore reserves the right to safeguard himself by Maritime Lien or the like in the vessel to the extent that this is authorized in a jurisdiction where the vessel can be found.

It is noted that the rule concerning venue and choice of law mentioned under point 6.7 shall be considered unwritten in relation to the rights conferred on the Seller according to the present point.

ENVIRONMENT

4.1 In case of spillage when bunker is taken onboard the vessel, the Buyer and the Seller shall be jointly obliged to coordinate their efforts to limit the damage as much as possible, whether or not one (1) party maintains that the other party is responsible for the accident. Positive disbursements for combating the pollution shall be borne equally by the parties, until the degree of guilt on both sides has been established through an agreement or a judgment. Half reimbursement of amounts disbursed shall be payable on demand.

4.2 If a third (3rd) party, including public authorities, should look to one (1) party or the other, or to both of them jointly, in connection with a pollution claim, the internal settlement shall take place following an evaluation of the degree of guilt. If the liability can be imposed on the parties on an objective basis, the loss shall be borne fully by the Buyer.

QUANTITY AND QUALITY

5.1 Quantity shall be determined at the Seller's option from the gauge or meter of shore or barge tanks. Such determination shall be conclusive, but the Buyer shall have the right to be represented a person or body that is mutually agreed between Seller and Buyer and this must be agreed at the time of confirmation of Contract between Buyer and Seller. Volume shall be adjusted to 15°C under prevailing ASTM-IP Petroleum Measurement tables.

5.2 Any claim pertaining to the quality of Marine Fuel delivered under the Contract must be based on tests made as soon as possible by an independent laboratory from the Seller's retained samples taken at the time of delivery from the shore tank or barge from which such delivery is made.

5.3 If the Buyer does not lodge a claim, in writing together with full details of the claim arising there from and supporting documents thereof as soon as possible, of the quantity or quality of the bunkers supplied within fifteen (15) days from the date of delivered date, any claim for damages against the Seller shall have lapsed.

5.4 The costs of any tests carried out at an independent laboratory that is mutually agreed to between Buyer and Seller shall be borne by the Buyer if the results favour the Seller, or by the Seller if the results favour the Buyer. Such test results shall be conclusive and binding between the Seller and the Buyer.

5.5 When the Buyer submits a claim pertaining to the quality of Marine Fuel delivered under the Contract, the Seller shall be entitled and the Buyer shall allow the Seller to board the Vessel and investigate the Buyer's claims, in particular, to check the Master's logs or the Vessel's records and to make copies of documents which the Seller may consider necessary for its investigations.

PAYMENT

6.1 Payment shall be made at Seller's place, by means of cable bank transfer according to the payment instructions in the invoice. If the purchase price has been agreed in another currency than United States Dollars ("USD"), the Buyer shall run the risk that this other currency may have a lower selling rate in relation to the Singapore Dollars ("SGD") on the date of payment than on the last correct date of payment (invoice date plus fifteen (15) days), and he shall consequently indemnify the Seller in SGD for any difference. Any profit as the result of an improvement of the rate shall go to the Seller.

6.2 The purchase price shall be payable upon delivery of the bunker oil. In case that the Seller's Terms and Conditions are not met, interests shall be charged on the amount due at a rate of 2.0% per month. Interests will be added each calendar month.

6.3 The Buyer shall not be entitled, without the Seller's consent, in writing, to offset any claims against the Seller, whether or not these claims are connected, and whether or not they arise out of the consignment concerned. Should the Buyer, nevertheless, offset an amount, the Seller's claim shall be increased by twenty (20) percent as a penalty.

6.4 If the Buyer has not effected payment within thirty (30) days from the date of delivery, the Buyer shall within one (1) week upon request forward an Admission of Debt worded in such a way that the document may be used as basis for execution in the homeland of the Buyer. This shall take place without prejudice for any counterclaims the Buyer may have. If the Buyer holds that he has a counterclaim, the Seller can only request the mentioned basis for execution, if a bank guarantee is established.

If said document is not forwarded by one (1) week after the Buyer has received an undertaking from the bank concerning coverage of the counterclaim, if it is justified, the claim against the Buyer shall likewise be increased by twenty (20) percent as a penalty.

6.5 If at any time the Seller is of the opinion before delivery to the Buyer that adequate assurance of the Buyer's ability to perform its obligations under these General T & Cs is lacking, or that the financial ability of the Buyer is impaired or unsatisfactory, the Seller may, in its absolute discretion, request the Buyer to pay cash in advance or to put up security acceptable to the Seller, and the Seller may withhold delivery until the Buyer complies with such requests, or failing the Buyer's compliance with such request within 3 working days from the date of request, the Seller shall be entitled to terminate the Contract but without prejudice to the Seller's right to claim damages from the Buyer.

6.6 All overdue payments may be applied, at the discretion of the Seller, first towards the settlement of interest outstanding before application to the principal payment sum under the Contract.

6.7 If the Seller is compelled to resort to any legal action or proceedings to recover any amount that is unpaid under this Terms and Conditions, the Buyer shall in addition be responsible for all legal fees and any extra expenses incurred by the Seller on an indemnity basis.

FORCE MAJEURE

7.1 The Seller shall not be liable for any loss, damage or demurrage howsoever arising and/or from any breach, delay or non-performance of the Contract and/or these General T & Cs to the extent such is caused by:

(i) any governmental act or compliance by that party with any order, request, or control of any governmental authority or person purporting to act thereof whether or not such order or request is later determined to be invalid (including compliance with or implementation of any order, request, plan or program of any authority created by governments); or

(ii) the interruption, unavailability, or inadequacy of Marine Fuel, or any constituent thereof, or any facility of production, manufacture, storage, transportation, distribution or delivery, because of wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labour or employment difficulties, fires, acts of God, accidents, breakdowns, weather conditions, or any other cause whatsoever which is not within the control of the Seller including, but not limited to, the failure, cessation, termination or curtailment in whole or in part of any of the existing or contemplated sources of supply of the Seller of Marine Fuel, or the crude oil or petroleum products from which such Marine Fuel is derived.

7.2 The Seller shall not be required to remove any such cause or replace the affected source of supply or facility, and, in the event of an actual or anticipated shortage of supply that directly or indirectly prevents the Seller from fulfilling its own requirements as well as those of its customers including its affiliated companies and the Buyer, the Seller may allocate available quantities of Marine Fuel to it, its customers and the buyer in its absolute discretion.

7.3 In the event that any governmental authority imposes any form of price control, rationing, allocation, or other emergency measures on the Seller's sales of Marine Fuel at the port where the Buyer desires to purchase Marine Fuel and has Contracted with the Seller for the same, then the Seller has the right to:

(i) suspend delivery of any Marine Fuel under the Contract for such periods as the Seller may determine are required to resolve uncertainties raised by such governmental actions or alternatively, to cancel such delivery and/or terminate the Contract if the Seller is of the opinion that the period of time required for such uncertainties to be resolved may be indeterminate or unforeseeable. In the event of such termination of Contract, the Seller shall be relieved of its obligations to perform hereunder; or

(ii) allocate such quantities of Marine Fuel to the Buyer as the Seller may determine to be appropriate in its absolute discretion and in respect of any shortfall of the Contractual quantity, the Seller shall be entitled to suspend delivery of such shortfall for such period as the Seller may determine are required to resolve uncertainties raised by such governmental actions or alternatively to cancel any further delivery of such shortfall if the Seller is of the opinion that the period of time required for such uncertainties to be resolved may be indeterminate or unforeseeable, in which event the Seller shall be relieved of any further obligations to perform under the Contract in respect of this shortfall. Where the Seller exercises the right to cancel any further delivery of such shortfall, the Buyer shall only be liable to pay for the quantity delivered and if full payment has already been made by the Buyer in respect of the Contractual quantity, the Seller shall refund the Buyer the value of such shortfall from the Contractual price which has been paid.

TERMINATION BY DEFAULT

8.1 Without prejudice to the foregoing, the following shall constitute events of default by the Buyer, entitling the Seller to terminate any Contract for the sale of Marine Fuel forthwith and claim any damages against the Buyer:

(i) Failure by the Buyer to perform any obligations under the Contract; and/or

(ii) Buyer becomes insolvent or has a liquidator, receiver, or judicial manager appointed or enters into any arrangement or composition with its creditors.

MISCELLANEOUS

9.1 In no event shall any claim be made by the Buyer and/or any recovery be had by the Buyer for indirect, special, incidental or consequential damages.

9.2 In the event that payment of the price is not received in full by the Seller from and within 30 days, or within the period stated in the Seller's invoice, from and including the date of delivery of Marine Fuel ("due date") supplied by the Seller to the Buyer, the Buyer agrees to assign and do so assign, effective from the due date, all rights, interests and claims, including rights of action in rem against any receiving vessel and/or her owners and/or bareboat charterers, arising in connection with their (i.e. the Buyer's) sale of such Marine Fuel to any receiving vessel(s) and/or her owners / bareboat charterers. For the avoidance of doubt, the Seller may if it so wishes to bring any action (including any action in rem) against the receiving vessel of the Marine Fuel in the Buyer's name or jointly in the names of Seller and Buyer. The Buyer irrevocably consents to have itself named as the Plaintiff or Co-Plaintiff in such action and herby authorizes all steps to be taken in connection with the commencement and continuance of such an action. A receiving vessel refers to the vessel to which the Buyer shall deliver or agree to deliver or has delivered, pursuant to any contract of sale or supply of Marine Fuel between him(i.e. the Buyer) and any third (3rd) party (including the owner or bareboat charterers of such vessel).

9.3 The Contract made in accordance herewith, its performance and enforcement shall be governed by the laws of Singapore and both the Buyer and the Seller shall submit to the non-exclusive jurisdiction of the Singapore Courts. Should any provision hereof be finally determined to be inconsistent with or contrary to applicable laws, such provisions shall be deemed amended or omitted, but only to the extent necessary, to conform with such application laws without affecting any other provision hereof or the validity of such agreement.



**福建省平潭县集美船务有限公司**
FUJIAN PINGTAN JIMEI SHIPPING CO., LTD.

叶 龙 文   高级船长
              PORT CAPTAIN
Ye Long wen

ADD:平潭县翠园南路 CUIYUAN SOUTH ROAD PINGTAN COUNTY
TEL: (0591)24365281(O)      (0591)4318828(H)
FAX:(0591)4365283 24319018  MOBILE:13067219773
P·C: 350400                  13960761758

# EXHIBIT B

**UNITED BUNKERING & TRADING**
(HK) Limited

# TAX INVOICE

Jimei Hua Shipping Co Ltd
3rd floor, building no.6
JinXiang E arer, pingtan country
fujian province, china.
China
Capt Ye

Invoice No.    : HK-INV-08-09-007
Invoice Date   : 8-Sep-2008

Payment Terms  : 30 days from delivery date.

Owners and/or Charterers and/or Managers and/or
Operators and/or M/V "Jimei Da" and/or
Jimei Hua Shipping Co Ltd
3rd floor, building no.6
JinXiang E arer, pingtan country
fujian province, china.
China
Capt Ye

*e-mailed 11-Sep-08*

For supply to M/V "Jimei Da" in Hongkong, SLA on 8 September 2008

| Description    | Quantity | Unit       | Unit Price | Invoice Amount |
|----------------|----------|------------|------------|----------------|
| IFO 180 Cst    | 200.000  | Metric Ton | 665.00     | 133,000.00     |
| Marine Gasoil  | 40.000   | Metric Ton | 965.00     | 38,600.00      |
|                | **Total Amount (USD)** | | | **171,600.00** |

EXCHANGE RATE   : USD1.0=HKD7.807
CURRENCY        : U.S. DOLLARS

**PAYMENT DUE DATE : 7-Oct-2008**

**REMITTANCE INSTRUCTIONS**

For The Account of       : **United Bunkering & Trading (HK) Ltd**
Banking Details          : **Den Danske Bank**
                           2-12 Holmens Kanal
                           Copenhagen, 1090
                           Swift : DABADKKK
                           Telex : 27000
U.S. Dollars Bank A/C No. : **IBAN No. DK9430003100148269**

UNITED BUNKERING & TRADING (HK) LTD

**NOTE:**
T/T REMITTANCE MUST BE FREE OF ALL CHARGES.
PAYMENT MADE AFTER DUE DATE WILL BE CHARGED AT AN INTEREST OF 2% PER MONTH

- Hong Kong: Suite 2313, Times Square Tower One, 1 Matheson Street, Causeway Bay  Tel: +852 2506 1388  Fax: +852 2506 1988  e-mail: ubt@ubt.com.hk
- Head Office: 7 Temasek Boulevard, #08-01, Suntec City Tower One, Singapore 038987  Tel: +65 6303 2288  Fax: +65 6303 2289  e-mail: ubt@ubt.com.sg

# UNITED BUNKERING & TRADING
(HK) Limited

Tel: +852 2506 1388  |  Fax: +852 2506 1988  |  Email: ubt@ubt.com.hk

Ref : HK-O-08-09-039

8 September 2008

To    : Jimei Hua Shipping Co Ltd 3rd floor, building no.6

Attn  : Capt Ye

Fax   : +86 591 24339058           Email : hkjmh@jmhshipping.com

RE    : SALES CONFIRMATION - "Jimei Da" @ Hongkong, SLA

Ref telecon, we are pleased to confirm the following sales under our terms and conditions :

OWNERS and/or CHARTERERS and/or MANAGERS and/or OPERATORS and/or BUYER of :

| | |
|---|---|
| Vessel | : Jimei Da |
| Port / ETA | : Hongkong, SLA / 8 September 2008 |
| ETB | : |
| ETD | : 8 September 2008 |
| Delvy Date | : 8 September 2008 |
| Qty & Grade | : 200 MT IFO 180 Cst |
| Price | : USD 665.00 / Metric Ton |
| Qty & Grade | : 40 MT Marine Gasoil |
| Price | : USD 965.00 / Metric Ton |
| Specs | : 180cst/mgo |
| Agent | : King Best - Capt Thomas (Tel: 852-2815-2285 / Fax: ) |
| Buyer | : Jimei Hua Shipping Co Ltd 3rd floor, building no.6, China |
| Seller | : United Bunkering & Trading (HK) Ltd |
| Payment | : 30 days from delivery date. |

Our General Terms and Conditions of Sale (March 2008) will apply. A copy of which is available upon request and it will be printed behind our tax invoice.

This supply will be made in accordance to the laws and/or regulations governing where nominated vessel will take bunkers from and/or to in the Courts of Judiciary where the Seller deems appropriate.

Thanks / Regards,

Max Hui
United Bunkering & Trading (HK) Ltd
Phone No.    : +852 2506 1388

FROM : WUI WING /REASON GROUP        FAX NO. : + 852 2687 3711        9 Sep. 2008 10:47   P1

## UNITED BUNKERING & TRADING (HK) LTD
2313 Times Square Tower One, 1 Matheson Street, Causeway Bay, Hong Kong
Tel: +852 2506 1388  Fax: +852 2506 1988

### Bunker Delivery Receipt

No.: 3207

Date 日期: 09-09-08
Delivery Barge 油躉: 江運3
Delivered to M/V/SS 船名: TIMEIDA
Owner / Operator 客戶:

Location 卸貨地點: 南丫島
IMO No. 船舶編號:

### TIME LOG 時間適用

| | | |
|---|---|---|
| Alongside 抵達 | | |
| Pump Start 開泵 | | |
| Pump Stop 停泵 | | |
| Depart 離開 | | |

### MGO CHARACTERISTICS 柴油規格

| | |
|---|---|
| Density at 15°C 密度在15°C | 0.856 |
| Viscosity (CST) at 40°C/50°C 黏度在40°C/50°C | 4.0/4 MAX |
| Sulphur Content %(m/m) 硫磺含量 %(m/m) | 0.5 VOL bT/MX |
| Flash Point °C 閃點 °C | 66.5 MIU |
| Oil Temperature °C 油溫 °C | 24°C |
| VCF (Table 54B) 換算係數 | 0.9898 K/L 0.8912 H/L |

| Product 油品 | Tank No. 油櫃 | By Sounding (Litres) 船艙量 | | Total in Litre 公升量 | Total in M/T 公噸量 | Others 其它 | Remarks 附注 |
|---|---|---|---|---|---|---|---|
| | | Before 之前 | After 之後 | Net 淨量 | | | |
| MGO | | | | 46700 | 46700 | 40.7 | |

### DELIVERED BY 給船人簽賣

We declare that the above products are in conformity with Annex VI of Marpol 73/78, regulations 14(1) and 18(1) and the quantities delivered are correct.

源通3
38

Master / Cargo Supervisor

### RECEIVED BY 收貨人簽署及船盖印

V. JIMEIDA
Master / Chief Engineer (with ship's stamp)

## Bunker Delivery Receipt

Date 日期: 8-9-08

Delivery Barge 油艇: 新潤17

Delivered to MV/SS 船名: WEI DA

Owner / Operator 東戶:

### TIME LOG 即時時間

| | |
|---|---|
| Alongside 抵達 | 19:30 |
| Pump Start 開泵 | 22:00 |
| Pump Stop 停泵 | 00:30 |
| Depart 離開 | |

Location 卸貨地點:

MO No. 船測號碼:

### CHARACTERISTICS 泊題類別

| | | Others 其它 | Remark 閒註 |
|---|---|---|---|
| Density at 15°C 密度在15°C | 0.97... | | |
| Viscosity (CST) at 40°C/50°C 黏度在40°C/50°C | 180 65.7 | | |
| Sulphur Content % (m/m) 硫磺含量% (m/m) | 0.24 | | |
| Flash Point °C 閃點°C | 66°C | | |
| Oil Temperature °C 油溫°C | 30°C | | |
| VCF (Table 54B) 換算指數 | 0.9913/0.00/45 | | |

| Product 油品 | Tank No. 油缸 | By Sounding (Litree) 缸裝讀數 | | Net 淨重 | Total in Litre 公升 股 | Total in M/T 公噸重 |
|---|---|---|---|---|---|---|
| | | Before 前讀 | After 後讀 | | | |
| MGO | | | | | | |
| F.Oil | 3-4 | 6550 70c | 706552 144 | D | 302060/302600/ | 290T |

DELIVERED BY 委埋人簽署

We declare that the above products are in conformity with Annex VI of Marpol regulations 14(1) and 18(1) and the quantities delivered are correct.

新潤3
[signature]

Master / Cargo Supervisor

RECEIVED BY 收貨人簽事及蓋印

安装, 洗油的海溢282, 有压為達有C.99t15° (每15°C均優差
246.99m3每原, 太空總收 202.3 m3. 試試兩段扣減約1.5 m3.

MTR: [signature]  M/V: JIME [signature]
[Chief Engineer's stamp]
Master / Chief Engineer (with ship's stamp)

## VERIFICATION

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

1. My name is Christopher Carlsen.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am a member in the firm of Clyde & Co US LLP, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my beliefs are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:   December 8, 2008
         New York, New York

_____
Christopher Carlsen

Sworn to before me this 8th day of December, 2008

_____
Notary Public

BARRY S. ALEXANDER
Notary Public, State of New York
No. 02AL6128147
Qualified in New York County
Commission Expires June 06, 2009

6